J-E01004-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 87 EDA 2025 |

Appeal from the Decree Entered December 10, 2024
In the Court of Common Pleas of Wayne County Civil Division at No(s):
2024-00024

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., STABILE, J., DUBOW, J.,
KUNSELMAN, J., McLAUGHLIN, J., KING, J., SULLIVAN, J., and
LANE, J.

DISSENTING MEMORANDUM BY SULLIVAN, J.:      **FILED AUGUST 5, 2026**

The Pennsylvania Supreme Court has declared, "[c]omplete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take[.]" *In re M.L.R.*, 351 A.3d 731, 738 (Pa. 2026) (citation omitted). Involuntary termination of a parent-child relationship is so consequential for a child and a parent our Supreme Court has likened it to the "death penalty in the dependency context." *Interest of K.T.*, 296 A.3d 1085, 1111 (Pa. 2023) (citation omitted). In so doing, our Supreme Court has held trial courts must avoid "a mechanical application of the law regarding the termination of parental rights," *In re Adoption of L.A.K.*, 265 A.3d 580, 593 (Pa. 2021), and analyze each child's particular developmental, physical, and emotional needs and welfare on a case-by-case basis with an eye toward each child's specific needs. *See Interest of K.T.*, 296 A.3d at 1105-06. Including

"utmost attention" to the parental bond, and "permanency, stability, and all 'intangible' factors . . . are all of 'primary' importance." *Id*. at 1109. It is evident that our Supreme Court's directive is to avoid a "check the boxes" approach to termination due to the permanency of termination and the unique and individual needs of each situation.

Likewise, this Court requires all participants in a termination case to provide us with "a robust, streamlined, and complete record[]." *In re Adoption of G.W.*, 342 A.3d 68, 95 (Pa. Super. 2025) (*en banc*).[1] Only when we possess a "robust, streamlined, and complete record" are the courts able to fulfill our role of determining the presence or absence of factual support for the trial court's weighty termination decision.

In the termination before us it is evident from the record facts this was not a customary or standard termination scenario and required a more detailed legal analysis and a more robust record. It is also evident from the record that a factually and legally insufficient "check the boxes" approach was employed as well as a "mechanical application" that did not take the individual circumstances and needs of A.K. into consideration or follow the mandate set by our Supreme Court in *L.A.K.*, 265 A.3d at 593.

_____

[1] Although termination proceedings "are often interrelated to dependency proceedings[,]" this Court does not automatically receive the dependency file when it receives termination records. *Id*. at 95-96 (Lazarus, P.J., concurring, joined by four other judges) (asserting the need for the petitioning agency to provide "a full and complete certified record").

At the time of the hearing, A.K. was a twelve-year-old boy recently moved to a residential diagnostic program after he went into "crisis" subsequent to his complaint of sexual abuse while in foster care with a foster family. *See* N.T., 12/6/24, at 16. He was living in a diagnostic facility, not in pre-adoptive foster care, and the conflicting record indicates that a foster family was not identified as of the date of the hearing, *see infra*. The only specific facts about A.K.'s status at the time of the hearing indicated he "went into crisis . . . he was starting to have sexualized behaviors . . . the safest place for him . . . was through a diagnostic which he has completed . . .." *Id*. In addition to no pre-adoptive foster family, it was indicated that he would need to be placed in a "step down" foster home after discharge from the facility and prior to his placement at an unidentified pre-adoptive foster home. *Id*.[2] So, A.K. was clearly not in a stable or permanent place at the time of the hearing. Furthermore, WCCYS determined a bond between Father and Child existed, to which no one involved in the termination proceedings objected. *See* N.T., 12/6/24, at 11-12.

Because of the "check the box" mechanical application of limited and often inaccurate facts to the law, in a situation that necessitated an in-depth analysis that took into consideration A.K.'s specific developmental, physical,

---

[2] The GAL indicated at oral argument that she spoke to A.K. several times; this information appears nowhere in the trial court record. If there is no record, for appellate purposes it did not happen. *See Stumpf v. Nye*, 950 A.2d 1032, 1041 (Pa. Super. 2008).

and emotional needs, I cannot endorse the trial court's failure to treat its termination decision with the gravity it merited, and I respectfully dissent.

**The Lack of a Sufficient Section 2511(b) Analysis**

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare'." ***In the interest of K.T.***, 296 A.3d at 1105. The courts should consider the matter from the child's perspective. ***Id***. In assessing 2511(b) the Supreme Court has identified factors "trial courts must always consider" namely:

> 1. Whether the children are in a pre-adoptive home and if there is a bond with the foster parents;
>
> 2. If the child has a bond with the biological parent, a bond analysis **must** be conducted.

***Id***. at 1106 (emphasis added).

The evaluation of a child's respective bonds is not always an easy task. This Court has stated "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists[.]" ***See In re K.Z.S.***, 946 A.2d at 762-63 (Pa. Super. 2008) (citation omitted). However, where there is evidence of a bond, the analysis is more complicated. As we held in ***K.Z.S.***, the bond analysis depends on the individual details of each case, and a court must take that into account in making its ruling. ***See id***. ***See also K.T.***, 296 A.3d at 1131 n.106 (Wecht, J., dissenting)

(recognizing that "[d]iscerning the effect upon the child of severing the parent-child bond is a difficult task, because it essentially requires the trial court to predict the effect upon the child of an event that is yet to occur").

Turning to the record in this matter, it is uncontested that WCCYS determined a bond existed between Father and Child. Ms. Bryant, a WCCYS supervisor, testified that the Agency determined a bond existed, the TPR Hearing worksheet (entered as Exhibit 2 in the record) reflects the existence of a bond, and the trial court adopted that assessment. **See** N.T., 12/6/24, at 11-12; Trial Court Opinion, 1/17/25, at 3-4. Although the Agency, through Ms. Bryant, recognized the existence of a bond, the only direct testimony regarding the bond was the conclusory statement that it was okay if the bond the Agency identified was severed:

> [Counsel for WCCYS]: Do you believe that there's a bond between [Child] and his dad?
>
> [Ms. Bryant]: Yes.
>
> [Counsel for WCCYS]: And do you believe that it's [in] the best interest of [Child] to sever that bond at this time pursuant to the [] petition for termination?
>
> [Ms. Bryant]: Yes.
>
> [Counsel for WCCYS]: Has the agency [] considered the child's developmental, physical, and emotional needs and welfare when you [] arrived at the conclusion that the bond should be severed? [Ms. Bryant]: Yes.

N.T., 12/6/24, at 11-12.

That was the only testimony in the entire hearing that discussed the bond, no analysis of why WCCYS determined a bond existed, and no analysis indicating why severance was in the child's best interest. In turn, the trial court adopted Ms. Bryant's conclusory statement without inquiry and cited no additional facts of record before summarily asserting severing the bond was in the child's best interest. This is the extent of the trial court's bond analysis:

> there is a bond between Father and [Child] but [Ms. Bryant] believed it would be in [Child's] interest for the [trial c]ourt to sever the bond. The [trial c]ourt agreed with WCCYS that termination of parental rights was in the best interest of [Child] because it would best serve his developmental, physical, and emotional needs and welfare.

Trial Court Opinion, 1/17/25, at 3-4.

The "why" is simply not explained regarding either the existence of or severing of the parent/child bond. Ms. Bryant failed to explain her conclusion, other than to refer to Father's visitation statistics, which, as explained below, are both noted as positive, *see* N.T., 12/6/24, at 11-15, and then skewed because after seeking termination and changing goals, the Agency prevented Father from visiting Child. *See id*.

The trial court's "reasoning" is the antithesis of the in-depth inquiry we discussed in *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). In place of independent scrutiny, the court mechanically relied on Ms. Bryant's answers to three yes/no questions the Agency's counsel posed. Neither Ms. Bryant nor

the trial court offered any explanation why the termination of an acknowledged bond with Father was in Child's best interests.[3]

The law provides when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. . . . Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

While the law does not require a formal bonding analysis and permits social workers and caseworkers to offer their opinions regarding the existence and strength of a bond and whether that bond should be broken without undue harm to the child, our law does not allow a caseworker's unsupported, conclusory assertions to constitute an adequate Section 2511(b) analysis. *See In re S.D.T.*, 934 A.2d 703, 707-08 (Pa. Super. 2007).

Although a court may base its termination decision solely on the testimony of a caseworker, that decision must be supported by record evidence. In *In re S.D.T.*, this Court reversed the trial court's decision to

---

[3] The majority emphasizes Father's failure to consistently visit Child prior to his being placed in care as a basis for concluding his bond with Child was neither necessary nor beneficial and as demonstrating his incapacity to parent. *See* Majority at 13-14, and n. 3. However, Ms. Bryant did not testify to this, and the trial court did not cite this as a basis for its reasoning. Moreover, Father testified, although the trial court did not discuss this, that his lack of visitation was because of his fears that Mother would abscond with Child if he pressed the issue, and his resumption of consistent visitation once Child was out of Mother's custody supports his testimony.

terminate a father's parental rights based on a caseworker's testimony that termination was in the child's best interest because the child had expressed suicidal ideation. *See S.D.T.*, 934 A.2d at 708-09. In reversing the termination decree, this Court noted the multiple deficiencies in the record, namely that it did not contain testimony about the reasons the child contemplated suicide, the child's psychiatric evaluation, or the child's hospital stay or his counseling sessions. Further, the child welfare agency performed no independent assessment of the likely effect of termination on the child. *See id*. In finding the record deficient, the *S.D.T.* court made clear that it did not dispute the occurrence of the events testified to, but declared the record insufficiently developed to allow the inference that Father's actions produced the child's suicide attempt:

> We are simply told that these events of a diagnostic nature occurred, and we do accept the fact that they did occur. However, we cannot discern from the present record how these events led to the conclusion that [the child's] thoughts of suicide were based solely on his disappointment with [Father's] unfulfilled promises. We do not say today that they were not so based; *we say only that a more detailed and specific development of the record below is needed in order for any court to determine their basis or genesis*.

*S.D.T.*, 934 A.2d at 708 (emphasis added).

Here, the best interest evidence was even less developed than that found insufficient in *S.D.T.* Ms. Bryant gave virtually no testimony regarding the existence of the parent-child bond or the best interest of the Child; she offered only a conclusory statement using the language of the legal standard.

- 8 -

Ms. Bryant did not explain the facts underlying her conclusory assertions that termination would best serve Child's needs and welfare. Instead, she gave one-word answers to three leading questions which parroted the language of Section 2511(b). **See** N.T., 12/6/24, at 11-12. Ms. Bryant's lack of specific testimony is particularly noteworthy because she is the assistant director of WCCYS and, by her own admission, had **no recent direct contact with either Father or Child**. **See** N.T., 12/6/24, at 5.

An in-depth analysis is especially necessary when, as here, the child is institutionalized and **not** in a pre-adoptive foster home. Even worse, this child was in "crisis" according to the record. **See** N.T., 12/6/24, at 16. The Supreme Court has stated "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, 71 A.3d at 268. As our Supreme Court recently explained in **K.T.**, 296 A.3d at 1113,

> a court conducting the [s]ection 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

The **K.T.** Court explained that the best interests inquiry must consider and weigh evidence including, but not limited to, the child's need for permanency and length of time in foster care, **whether the child is in a pre-**

***adoptive home and bonded with foster parents***, and whether the foster home meets all the child's needs "including intangible needs of love, comfort, security, safety, and stability." ***Id***. (footnote omitted).

The limited nature of the evidence and court analysis is further underscored by the fact neither the GAL nor Child's legal counsel opined regarding ***Child's*** status or feelings about his bond with Father or whether he felt it would be in his best interests to sever the bond with Father. Where Child's voice is completely absent from the record, at the very least the court should have sought testimony from Child's treating professionals regarding the effect on Child of severing the bond and should have at least considered the possibility of ordering a formal bonding analysis.

In addition to a bond analysis, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with a foster parent and should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child. ***In re N.A.M.***, 33 A.3d at 103.

Here, there is no record evidence that the Agency or the trial court performed this essential part of the 2511(b) assessment either. The record is devoid of any testimony from anyone who spoke directly to Child to determine Child's feelings, thoughts, or preferences. Critically, because of his age, Child cannot be adopted legally without his consent, yet no one, not even the

advocates appointed on his behalf, provided the court with any information regarding Child's preferences. **See** N.T., 12/6/24, at 37; **see also** 23 Pa.C.S.A. § 2711(a)(1).

What we do know from the record is that A.K. was not in a pre-adoptive foster home, and there was conflicting testimony as to whether a foster home was even identified. Ms. Bryant identified a family that "might" be a "likely candidate" but did not give any specific details of the unidentified family, nor did the trial court inquire. N.T., 12/6/24, at 12. However, upon review of the certified record, and the TPR hearing worksheet, entered as Exhibit 2, it indicates that the Agency had not identified an adoptive home for A.K. **See** Exhibit 2, Termination Petition 11/5/24, at 5. The record also reflects A.K. would have to enter a "step down" foster home before the unidentified family could take him into their care. **See** N.T., 12/6/24, at 16. Likewise, the record does not indicate A.K.'s progress at the residential treatment facility, or any timeline for his recovery or discharge. Simply put, there is nothing in the notes of testimony or trial court opinion that speak to stability, comfort, love or safety in his current situation, and the record certainly contains no reflections of the Child's welfare or mindset at the time of the hearing. Where the analysis contains no indication of the "intangibles" in A.K.'s life, we risk the danger of producing "state-created orphans", an outcome our Supreme Court warns against. **In re T.S.M.**, 71 A.3d 251, 268 (Pa. 2013).

The GAL's presentation at oral argument did not complete the picture that it left incomplete below.[4] The *en banc* oral "argument" can be fairly summarized as follows: (1) all parties were familiar with the dependency record so there was no need to make a detailed record at the termination proceedings;[5] (2) because of that familiarity, the parties (apparently including Father's counsel) tacitly agreed to do a perfunctory job on the initial appeal

_____

[4] Prior to, and at, oral argument *en banc*, the GAL and the Agency acknowledged the deficiencies of the Section 2511(b) evidence. **See** Participants Brief, at 28-29 (discussing contacts between GAL and Child and trial court's familiarity with the record but claiming it was not necessary to put this information on the record at the termination hearing). They claimed they corrected this deficiency by forwarding the dependency file to this Court. However, our docket does not show that the trial court forwarded a supplemental record. I have been unable to locate the file, and the Majority does not cite to it in their Memorandum. Further, there is no indication that either the GAL or the Agency sought to comply with Pennsylvania Rule of Appellate Procedure 1926 which allows for correction or modification of the record on appeal. Thus, even if I were able to locate the dependency file, I would be unable to consider it at this juncture. **See Commonwealth v. Stokes**, 2019 WL 2114200, at *2 n.6 (Pa. Super. May 14, 2019) (refusing to allow supplementation of the record where the party did not comply with Pa.R.A.P. 1926(b) and, therefore, not considering the newly submitted evidence).

[5] The practice of having the judge who presides over the dependency proceedings and the termination hearing is not uniform throughout this Commonwealth. Moreover, while the parties and the trial court may be familiar with the underlying facts, this Court is not, and we cannot review what is not placed on the record. An implicit request to "trust us" is not a sufficient basis to affirm the termination of parental rights. Likewise, counsel provided no legal support for the "trust us" review.

and the GAL, therefore, did not submit a brief;[6] 3) GAL and the trial court had been in frequent contact with Child and he wanted to be adopted; and 4) at the time of the *en banc* argument Child is currently placed in a pre-adoptive home and has bonded with his foster parents.[7]  There is **no** record support for the GAL's assertions at *en banc* oral argument.  This Court may not rely on facts dehors the record nor does it adjudicate cases based on statements made at oral argument.  ***See Branham v. Rohm and Haas Co.***, 19 A.3d 1094, 1100 (Pa. Super. 2011); ***see also Smith v. City of Philadelphia***, 147 A.3d 25, 34 (Pa. Cmwlth. 2016) (stating "a court may not properly base an adjudication on matters stated in oral argument that do not appear of record[.]" (citation omitted)).[8]

Even if we were permitted to consider GAL's statements at oral argument, they would not support the trial court's termination decree, which did not rely on the dependency file or any of the conclusory summations made

_____

[6] I note with disapproval that Child's legal counsel neither submitted a brief nor appeared at oral argument.

[7] Given the particular facts of the instant matter, it would have been prudent for WCCYS to have delayed the termination hearing until Child was out of residential treatment and successfully placed in a pre-adoptive home, which would have enabled the trial court to write a comprehensive Section 2511(b) analysis.

[8] While decisions of the Commonwealth Court are not binding upon us, they may serve as persuasive authority.  ***See Commonwealth v. Ortega***, 995 A.2d 879, 885 (Pa. Super. 2010).

by the GAL at *en banc* oral argument.[9] Contrary to the GAL's assertion, at the time of the hearing, Child was not in a loving, stable pre-adoptive home. Instead, Ms. Bryant, the Agency's own witness, testified Child was in a residential facility for diagnostic treatment and was sent there because he was in "crisis". N.T. 12/6/24, at 16. Further, the record is devoid of any description of the Child's diagnosis, treatment, or expected length of stay.

The Court noted that there was no identified family to take A.K. either, but a "likely candidate," and made the assumption that (at some point in the future?) that unidentified family would surely "bring security and stability to A.K.'s life". Trial Court Opinion, 1/17/25 at 4. Since this potential family remained unidentified, and it was an uncontested fact that at the time of the hearing A.K. was in a residential facility, one can only assume the trial court was proceeding on a hunch. Interestingly, the trial court does not mention A.K. anywhere in the opinion -- not that he was in crisis, institutionalized, or that he made a complaint of sexual abuse at the foster home prior to his admission into a facility. This is hardly an analysis of A.K.'s "particular developmental, physical, and emotional needs and welfare." ***See Interest of K.T.*** , 265 A.3d at 1105-1106.

---

[9] Reference is made to *en banc* oral argument specifically because none of the summations mentioned at oral argument appear in the GAL's written product either.

- 14 -

In its Memorandum, the Majority briefly mentions the paucity of the record in general. **See** Majority Memorandum, at 15-16. However, it disregards the trial court's lack of Section 2511(b) analysis. **See id**. Instead, the Majority simply finds, with little explanation or citation to relevant authority, Ms. Bryant's cursory and conclusory testimony, accepted without analysis by the trial court, satisfies the mandate for a robust record, and thorough Section 2511(b) analysis. **See id**. at 11-15; **see G.W.**, 342 A.3d at 95. I cannot agree. Standing alone, the trial court's failure to undertake a thorough (if any) Section 2511(b) analysis is sufficient to remand this matter for a new termination hearing.

## The conflation of the Section 2511(a) sub-sections and lack of a particularized analysis.

The record shows the court's Section 2511(a) review contains errors of both fact and law. First, in its five-page opinion, the court found the Agency presented clear and convincing evidence to support termination under subsections (2), (5) and (8), without setting forth the particular record facts to the individual elements of those specific subsections or how the facts relied upon supported them.[10] This Court has noted we must "hew closely to the

_____

[10] This Court has specifically criticized an analysis that conflates the distinct bases for involuntary termination. Because a court is required to analyze the specific circumstances supporting termination under the distinct statutory language of each subsection, "a court errs by indiscriminately applying caselaw analyzing one subsection to another." **See G.W.**, 342 A.3d at 85-86.

statutory language. The grounds are not interchangeable[.]" **G.W.**, 342 A.3d at 86. Moreover, the Supreme Court has held the statutory grounds under section 2511(a) are distinct and cannot be conflated. **See**, **In re Adoption of S.P.**, 47 A.2d 817, 827-28 (Pa. 2012).

In the instant matter, the trial court not only conflated the subsections it applied, but it also erred as a matter of law in applying subsections (5) and (8) because Father never had custody of the Child. Subsections (5) and (8) are inapplicable **as a matter of law** to a parent that does not have custody of the child. **See In re C.S.**, 761 A.2d 1197, 1200-01 (Pa. Super. 2000) (*en banc*) (holding parental rights cannot be terminated pursuant to subsections (5) and (8) when the subject child had never been in the custody of the parent in question and thus could not have been removed from the parent's care); **see also in re Adoption of M.B.**, 2025 WL 472677, at *6 (Pa. Super. Feb. 12, 2025) (unpublished memorandum) (same) (cited pursuant to Pa.R.A.P. 126(b)). Thus, the trial court should have dismissed subsections (5) and (8) outright given the uncontested record fact that Father never had custody of A.K. and then analyzed the only viable remaining ground for termination, subsection (a)(2), instead of summarily concluding that the Agency proved the elements of all three subsections.

## The inadequate and inaccurate Section 2511(a)(2) analysis

Turning to the trial court's sole viable remaining legal ground for termination, Subsection (a)(2) provides:

- 16 -

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * * * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

As previously indicated, the trial court's five-page opinion cites limited facts relied upon to determine termination was warranted. The trial court generally relies on four or five facts for the entirety of its termination analysis. Of those four or five facts, two are incorrect and contrary to the record, and the others are anemic and missing key details.

One of the few substantive facts the court relied upon in its 2511(a)(2) analysis was that Father "had not seen [Child] in over a year except for a goodbye visit [in June 2024.]" Trial Court Opinion, 1/17/25, at 3 (citing Ms. Bryant's testimony).[11] This assertion is incorrect. Ms. Bryant actually testified that prior to December 2022, **when Child was taken into placement**, Father had not seen Child for more than one year; however, Ms. Bryant testified that **after** Child was in placement, "he [Father] was having contact

_____

[11] The Majority simply corrects this statement without discussing how the trial court's incorrect reliance on it impacted the decision in this matter. **See** Majority Memorandum, at 2, 3, 10.

- 17 -

with his son at least twice a month and [sic] regularly" even after Father's incarceration (via Zoom). **See** N.T., 12/6/25 at 12-13.

Even more egregious than its misstatement of the facts, the trial court ignored evidence showing that the Agency, not Father, cut off Father's contact with Child. Ms. Bryant's testimony demonstrated Father had endeavored to maintain contact with Child from placement in December 2022 until the goal changed to adoption in May 2024, **when WCCYS no longer permitted contact**. **See id**. at 11, 15. As Ms. Bryant testified, "He [Father] would've [sic] attended any number [visits] offered to him . . . He never refused any visits with his son." **Id**. at 14.

The trial court also relied on another inaccurate statement, namely that after May 2024, Father was purposefully and intentionally noncompliant with his permanency plan. **See** Trial Court Opinion 1/17/2025 at 3. In its opinion, the trial court asserts there had been "no compliance" and "no progress" since May 28, 2024. This conclusion misleadingly implies Father's indifference produced his lack of visitation, when Ms. Bryant herself testified that when Child's goal was changed to adoption in May 2024, "we ordered at the goal change a goodbye visit and there would be no further contact for him and [Child] even if he was paroled." N.T., 1/6/24, at 5, 23-25. Thus, the record is clear on Ms. Bryant's testimony; it was not Father's indifference; rather, the court and Agency's actions, namely goal change to adoption, which prevented Father from having any further contact with Child. **See** Trial Court Opinion,

1/17/25 at 3. The evidence presented by Ms. Bryant does not substantiate the trial court's conclusions of Father's non-compliance after May 2024.

Additionally, the trial court's conclusion Father was not in compliance with his goals lacks record support, and the record falls short of identifying specifics about the goals and any goal modifications once Father was incarcerated. The record contains only vague references to Father's goals, his alleged non-compliance, and what, if any, goals WCCYS had for him once he was incarcerated and what services they offered him throughout the course of the case. As indicated previously, the dependency file was not provided in the certified or reproduced record, and the trial court was not specific in its findings regarding the issue. We cannot assess record support for testimony that Father only moderately complied with his goals when the record fails to indicate what those precise goals were, and what "moderate" compliance means.

Further, both the trial court and the Majority disregard this Court's recent holding wherein we vacated the termination of a father's parental rights under very similar facts. In *In re: T.L.H.*, 336 A.3d 1069 (Pa. Super. 2025), we acknowledged a court is not required to consider whether an agency made reasonable efforts to provide reunification services to a parent prior to terminating parental rights, but emphasized it may not actively impede contact an incarcerated parent seeks with his child, and then fault him for the lack of contact: "*[a] child welfare agency cannot refuse reasonable*

***efforts to an incarcerated parent and then point to the resulting erosion in the parental bond created by the agency as justification for termination of parental rights.***"[12]   ***Id***. at 1086-87 (citation omitted) (emphasis added).   This Court concluded it was improper to involuntarily terminate a father's parental rights where he had maintained regular contact with the child while incarcerated, their contact only ceased because the agency stopped permitting the visits, the father had been unable to obtain services while incarcerated and none had been ordered by the court, and the father was set to be released within a reasonable period of time.   ***See id***. at 1089.

Like the facts in ***T.L.H.***, Father here maintained regular contact with Child while incarcerated ("he never refused any visits with his son") N.T. 12/6/24, at 14, until the May 2024 goal change to adoption and WCCYS's refusal to facilitate any subsequent contact.   ***See*** N.T., 12/6/24, at 15.   Father cooperated with WCCYS, and WCCYS acknowledged Father was unable to receive services while incarcerated.   ***See*** Petition for Involuntary Termination of Parental Rights, 8/23/24, at 5 (unnumbered); ***see also*** N.T., 12/6/24, at 14 (acknowledging any missed visits during Father's incarceration were the fault of the prison, not Father, and that Father was unable to parent Child due to his incarceration).   I see no dispositive difference between the instant

---

[12] In WCCYS's petition seeking involuntary termination of Father's parental rights, its main cited basis was Father's incarceration, which prevented him from participating in Child's therapy or receiving services.   ***See*** Petition for Involuntary Termination of Parental Rights, 8/23/24, at 5 (unnumbered).

matter and *In re T.L.H.* A trial court "must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998). The facts are lacking in the record to allow the trial court to conduct this mandatory examination. Thus, the evidence presented does not substantiate the trial court's conclusion, and the conclusion lacks record support.

Thus, both the paucity and mischaracterization of the limited amount of record facts, in addition to this Court's recent holding that at least requires a deeper understanding of what, if any, plan modifications Father was tasked with when he was incarcerated needs to be in the record and analyzed. The record and opinion as they stand currently do not contain enough pertinent and accurate facts to constitute an adequate 2511(a)(2) analysis.

Both the record and the opinion in this matter fall woefully shy of *L.A.K.*'s mandate to serve the needs and welfare of each individual child in "his or her particular circumstances". *In re adoption of L.A.K.*, 265 A.3d at 593. As the GAL exposed at oral argument, all of the parties were familiar with the dependency record, so a perfunctory "check the box" hearing ensued (arguably it did not even rise to "check the box" level because no one managed to put any testimony on regarding the 2511(b) analysis, so it stands to reason that crucial box was not even checked). They performed as if this were your

average termination hearing, when it clearly was not--what they had in front of them was a 12-year-old child in "crisis" (their words, not mine) that was institutionalized and getting treatment as a result of possible sexual abuse at a foster home (a fact that was avoided and skirted in the record), an agency determination that Father and Child were bonded (WCCYS made the call and no one objected), a Father who made 80 percent of the visits with Child subsequent to dependency determination in December 2022, no information about Child's status in the institution or how Child felt about adoption and/or the bond with Father, and no identified pre-adoptive foster home. This was not the termination of parental rights of a two-year-old born into agency custody, currently in a loving pre-adoptive home that provided stability, consistency and love to child, with a father that abandoned him and an agency report of no bond, and no subsequent parental cooperation whatsoever. The overarching problem here was the court went through the motions checking boxes in a situation that required more.

I prescribe no particular outcome here. With the limited record before us, it is clear Father is flawed. I am merely saying that we cannot discern from the present record the necessary record evidence and analysis for termination of Father's parental rights. As this Court stated in **In re S.D.T.,** "we say only that a more detailed and specific development of the record below is needed in order for any court to determine their basis or genesis." **Id.** 934 A.2d at 707-708. The record before us does not permit this Court to

fulfill its reviewing role and obligation with confidence that the trial court's weighty decision rests on accurate facts and adequate legal analysis.

We are mandated to satisfy the Supreme Court's dictate of a thorough review making the Child's needs and welfare analysis paramount. If we are going to terminate parental rights and impose the "death penalty" in the dependency context, it is incumbent upon trial courts to make a thorough record, and upon legal counsel and *guardians ad litem* to participate by presenting evidence, questioning witnesses, and ensuring the child's viewpoint is placed on the record. Moreover, this Court abdicates its role as a reviewing court, when it simply rubber-stamps a trial court's "check the boxes" decision based on an inadequate record because it believes the result is correct. While I have no wish to deny this Child the permanent home the GAL claims he wants, I believe it would be better to remand this matter for a new termination hearing, so a proper record can be made which supports this decision AND follows the mandates of our Supreme Court.[13] Accordingly, I respectfully dissent.

Judges Stabile, King and Lane join this dissenting memorandum.

_____

[13] In making this recommendation, I am cognizant of the fact that our family courts are overburdened. Nonetheless, given the particular circumstances of this case, I cannot condone the cursory review of the complicated, unusual factors present in this matter, the lack of record review, and the mistaken facts relied upon by the trial court.